## STATE OF CONNECTICUT *v.* TIMOTHY DOBSON
### (14251)

PETERS, C. J., SHEA, GLASS, COVELLO and BERDON, Js.

Argued October 1, 1991—decision released February 4, 1992

*John F. Merchant,* with whom, on the brief, was *Mark Phillips,* for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Robert A. Lacobelle,* assistant state's attorney, for the appellee (state).

COVELLO, J. This is the defendant's appeal from his conviction of murder in violation of General Statutes § 53a-54a (a).[1] The issues on appeal are whether the

---

[1] General Statutes § 53a-54a (a) provides: "MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonable-

trial court: (1) erred in allowing into evidence the defendant's postarrest statements to the police; and (2) improperly limited the cross-examination of a state's eyewitness. We now affirm.

The jury might reasonably have found the following facts. On October 21, 1988, at approximately 6 p.m., the defendant shot and killed the victim, Joseph Rucker, at the P.T. Barnum Apartments in Bridgeport. The jury found the defendant guilty of murder. The trial court sentenced the defendant to a term of sixty years to run consecutively with sentences already being served.

## I

The defendant first claims that the trial court improperly denied his motion to suppress as evidence his postarrest oral statements made to Detective Robert Kwet and Patrol Officer Paul Carlson. The trial court subsequently admitted these statements into evidence. The facts relevant to this issue are as follows. At about 3 p.m. on October 24, 1988, Bridgeport police arrested the defendant and charged him with unlawful restraint.[2] At the police station some time later, the police advised him that he was also being arrested for murder.

Upon the defendant's arrival at the police station, Detective Leo Krusinski read the defendant the warnings required by *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), from a printed form and then asked him to complete the top portion of the form that requested general information concern-

ness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] The state never formally charged the defendant with this crime.

ing his name, age and educational background. The defendant's responses revealed that he had completed eleventh grade and could read and write. In addition, Krusinski requested that he read the *Miranda* rights appended to the form and put his initials by each one if he understood the rights. The defendant initialed each right and also complied with a further request to read and initial a waiver of his *Miranda* rights to document his waiver of the right to an attorney and his willingness to be interviewed and answer questions. Krusinski also asked the defendant to sign the form indicating that he understood all of his rights, but the defendant, maintaining that he would not sign without first consulting his attorney, refused to sign the document. As Krusinski began to write a note on the report concerning the defendant's refusal to sign, the defendant changed his mind and, without further comment from Krusinski, signed the form.

At about 3:30 p.m., Lieutenant Michael Kozlowski, who was also present, signed the report as a witness along with Krusinski. After the defendant completed and signed the form, he asked Kozlowski if he could telephone his attorney. Kozlowski allowed him to place the call but the line was busy. Kozlowski then brought the defendant to Kwet, who had the original murder warrant, and advised Kwet that the defendant had already read his *Miranda* rights and had unsuccessfully tried to contact his attorney and would like to try again.

Kwet formally served the defendant with the warrant and then, without any questioning by the detective, the defendant asked him the date and time of the murder. After Kwet responded to his inquiry, the defendant immediately offered an alibi that he was at a bar called Nick & Neal's with "two girls," both named Maria, at the time of the shooting. Following the defendant's explanation, Kwet asked him if he was willing to make a statement. The defendant declined, stat-

ing that he would answer questions but would not sign a statement until he spoke with his attorney. Kwet then allowed him to telephone his attorney but the attorney was not in his office. The police then placed the defendant in a booking area cell.

At 7 p.m., Carlson, who was just beginning his evening shift, brought the defendant to the detective bureau. Carlson, who had been investigating the murder, allowed the defendant to telephone his girlfriend and, following their phone conversation, he again read the defendant the *Miranda* rights. After reading a rights form identical to the one that he had earlier signed, the defendant asked Carlson if he could reduce his bond. After Carlson said he could not, the defendant said that he would not complete and sign the rights form without first consulting his attorney. Nevertheless, he said he was willing to answer questions about the homicide investigation. In response to an inquiry about the murder, the defendant told Carlson that he belonged to a gang called the "Terminators." The defendant said that the leader of the gang had sent a member to bring the victim back to the P.T. Barnum Apartments so they could shoot him. The defendant admitted to having a gun when the gang surrounded the victim but said that it was Vincent Green who shot and killed the victim with an AK-47 rifle.

The defendant argues that because he did not initiate the discussions with Kwet and Carlson, his statements to them should not have been admissible.[3] He claims that his invocation of the right to counsel should act as a complete invocation of this right and cover any of his subsequent statements, oral or written. The defendant asserts that his statements are inadmissi-

---

[3] The defendant does not argue that he did not understand his rights or any waiver thereof or that he was in any way "threatened, tricked, or cajoled" into any waiver. *Miranda* v. Arizona, 384 U.S. 436, 476, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

ble under the *Smith* v. *Illinois,* 469 U.S. 91, 92, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984) (per curiam), test for a waiver of the right to counsel enunciated in *Connecticut* v. *Barrett,* 479 U.S. 523, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987). "That [test] requires a finding that the suspect '(a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.' *Smith* v. *Illinois,* [supra, 469 U.S. 95]. See also *Edwards* [v. *Arizona,* 451 U.S. 477, 485–86 n. 9, 101 S. Ct. 1880, 68 L. Ed. 2d. 378 (1981).]" *Connecticut* v. *Barrett,* supra, 479 U.S. 527. As to the alibi disclosed to Kwet, we conclude that the defendant initiated those discussions and waived his right to counsel in a knowing and intelligent manner. With respect to the statements made to Carlson, we are unpersuaded that the test for waiver of the right to counsel is applicable to the circumstances of these statements. We address these two statements seriatim.

## A

Assuming, arguendo, that the defendant invoked his right to counsel when he asked to telephone his attorney, we are persuaded from the evidence that the defendant thereafter initiated the conversation with Kwet that led to the disclosure of his alibi. It is clear from an examination of the record that Kwet served the murder warrant on the defendant without attempting to initiate interrogation. Furthermore, the actual serving of the warrant itself is a procedural formality not tantamount to an initiation of interrogation. *State* v. *Evans,* 203 Conn. 212, 225–29, 523 A.2d 1306 (1987). The defendant then initiated a dialogue by inquiring about the circumstances of the murder and, thereafter, offered his alibi. We are also convinced that, pursuant to the second prong of the *Smith* v. *Illinois* test, there was a waiver of the right to counsel in a knowing and intelligent manner when, as here, the defendant, who had an eleventh grade education and could read and

write, had, less than fifteen minutes prior to volunteering his alibi, signed the prescribed form indicating that he understood all of his *Miranda* rights.

B

With respect to the remarks made to Carlson, we first note that on remand[4] from the United States Supreme Court in *Connecticut* v. *Barrett,* we held that the *Smith* v. *Illinois* test was inapplicable and that a defendant's oral statements are admissible when, in a limited invocation of his right to an attorney, an accused agrees to make oral statements but refuses to endorse written ones without consulting an attorney. *State* v. *Barrett,* 205 Conn. 437, 448–49, 534 A.2d 219 (1987); see also *Connecticut* v. *Barrett,* supra, 479 U.S. 529. In *Barrett,* the defendant, after signing an acknowledgment that he had received his *Miranda* warnings, told the police that "he would not give [them] any written statements but he had no problem in talking about the incident."[5] *Connecticut* v. *Barrett,* supra, 479 U.S. 525. The defendant fails to distinguish *State* v. *Barrett,*

[4] The procedural history of the *Barrett* case is as follows. "In our original decision in this case, we concluded that the statements were inadmissible under the fifth and fourteenth amendments to the United States constitution. *State* v. *Barrett,* 197 Conn. 50, 495 A.2d 1044 (1985). We declined to consider what state constitutional rights the defendant might have had because he had raised no such claim either in the trial court or before us. Id., 54 n.3. The United States Supreme Court concluded that we had misinterpreted the applicable precedents and held that the statements were admissible as a matter of federal constitutional law. Accordingly, it reversed our judgment and remanded the case for further proceedings not inconsistent with its opinion. *Connecticut* v. *Barrett,* 479 U.S. 523, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987)." *State* v. *Barrett,* 205 Conn. 437, 438–39, 534 A.2d 219 (1987). On remand, we concluded "that the trial court correctly admitted the defendant's oral statements into evidence." Id., 439.

[5] Although not addressed in *Connecticut* v. *Barrett,* 479 U.S. 523, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987), there is evidence that the defendant in *Barrett,* made a telephone call to his attorney while in custody. *State* v. *Barrett,* 197 Conn. 50, 56, 495 A.2d 1044 (1985).

supra, 205 Conn. 437, but instead contends that *Connecticut* v. *Barrett* still requires an analysis under the *Smith* v. *Illinois* two-prong test for a waiver of the right to counsel.

In *Connecticut* v. *Barrett,* the United States Supreme Court decided that there was no need to consider even the first prong of the *Smith* v. *Illinois* test, i.e., whether the defendant " 'initiated further discussions with the police,' " because there, as here, the defendant's willingness to make oral statements did not represent an "ambiguous or equivocal response to the *Miranda* warnings . . . ."[6] *Connecticut* v. *Barrett,* supra, 479 U.S. 529 n.3. "To conclude that [the defendant] invoked his right to counsel for all purposes requires not [only] a broad interpretation of an ambiguous statement, but [also] a disregard of the ordinary meaning of [his unequivocal] statement." *Connecticut* v. *Barrett,* supra, 479 U.S. 529–30. Because the defendant clearly manifested his intent, in an unambiguous manner, to answer questions but not sign anything, we conclude that his statements to Carlson are not subject to this test.

The defendant, however, relies on *Minnick* v. *Mississippi,* 498 U.S. 146, 111 S. Ct. 486, 112 L. Ed. 2d 489 (1990), claiming that because he requested counsel, he should not have been interrogated without counsel present. In *Minnick,* federal law enforcement officials ended their interrogation of the defendant once he requested counsel. After the defendant conferred with

---

[6] The defendant's second telephone call to his attorney occurred immediately after he told Carlson that he was willing to answer questions but not willing to sign anything until he spoke with his attorney. Throughout the period in issue, he twice said that he was willing to answer questions and three times said that he would not sign anything without his attorney. In light of these repeated assertions, we conclude that the defendant unequivocally manifested an intent to discuss freely with the police any aspect of their investigation and that his desire to contact counsel was only in connection with anything that would be reduced to writing. There is no allegation here that the police obtained any written statement against his will.

counsel, a county deputy sheriff, telling the defendant that "he could not refuse," reinitiated the interrogation resulting in the defendant's confession. The United States Supreme Court reversed the conviction and held that "when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." Id., 489–91.

*Minnick* is distinguishable from the case at bar because in *Minnick* it was clear that the defendant had invoked his right to counsel for all purposes. Here, it is equally apparent that there was only a limited invocation of that right for written statements; the defendant repeatedly asserted his willingness to make oral statements to the police. Here, the defendant never requested counsel to be present for the purpose of discussing the shooting with the police. The defendant's "expressed willingness to speak may well have had its origins in a misperception about the risk associated with incriminatory oral communications"; *State* v. *Barrett,* supra, 205 Conn. 449; but "we have never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.' [*Oregon* v. *Elstad,* 470 U.S. 298, 316, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985); *Colorado* v. *Spring,* 479 U.S. 564, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1987)]." *Connecticut* v. *Barrett,* supra, 479 U.S. 530.

## II

The defendant next claims that he was not allowed to cross-examine fully a prosecution witness, Ophelia Williams, because the trial court: (1) disallowed his attempt to elicit from Williams that her prior felony conviction was for possession of narcotics with intent to sell; (2) denied access to Williams' presentence investigation report (PSI) prepared with respect to her narcotics felony conviction; and (3) limited his cross-

examination of Williams on the extent of her drug usage. We conclude that no improper curtailment of the defendant's cross-examination occurred.

## A

The defendant first contends that even though he cross-examined Williams about her prior felony conviction and her continuing probation resulting from that conviction, he should have been able also to cross-examine her as to the nature of the felony, i.e., possession of narcotics with intent to sell.

"The defendant's right to cross-examination . . . is not absolute and is subject to reasonable limitation by the court." *State* v. *Thompson,* 191 Conn. 146, 148, 463 A.2d 611 (1983). "The general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge. This discretion comes into play . . . after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment. *State* v. *Castro,* 196 Conn. 421, 424, 493 A.2d 223 (1985); *State* v. *Gaynor,* 182 Conn. 501, 508, 438 A.2d 749 (1980). The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which the jurors, as the sole triers of the facts and credibility, can appropriately draw inferences relating to the reliability of the witness. *United States* v. *Vasilios,* 598 F.2d 387, 389 (5th Cir. 1979) [cert. denied, 444 U.S. 967, 100 S. Ct. 456, 62 L. Ed. 2d 380, cert. denied sub nom. *Alexander* v. *United States,* 444 U.S. 932, 100 S. Ct. 277, 62 L. Ed. 2d 190 (1979)]; *State* v. *Castro,* supra, 425." *State* v. *Vitale,* 197 Conn. 396, 402, 497 A.2d 956 (1985). With respect to narcotics felony convictions, this standard is met when, as here, the defendant is allowed to impeach the witness by eliciting a prior, *unspecified* felony conviction. *State* v. *Geyer,* 194 Conn. 1, 16, 480 A.2d 489 (1984).

In *Geyer,* we held that narcotics convictions are crimes which "do not reflect directly on the credibility of one who has been convicted of them." *State* v. *Geyer,* supra, 12; see also *United States* v. *Gross,* 603 F.2d 757 (9th Cir. 1979) (evidence of prior convictions for narcotics offenses are not within the concept of crimen falsi and are therefore inadmissible unless the government bore the burden of proving that the probative value of prior convictions for impeachment purposes exceeded the prejudicial effect); see generally 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 609 [4] n.29. Crimes not reflecting directly on credibility are not per se admissible for impeachment purposes but must survive a balancing of probative value versus prejudicial tendency; crimes in this category are not as readily admissible as those that "by their very nature indicate dishonesty or tendency to make false statement[s]." *State* v. *Geyer,* supra, 12, citing *State* v. *Nardini,* 187 Conn. 513, 523–24, 447 A.2d 396 (1982).

We further noted that, when the trial court is faced with a decision of whether to admit, as evidence of credibility, crimes which do not reflect directly on credibility, the prudent course, one that would diminish the prejudicial effect, would be to allow the defendant to mention that the witness was convicted of an unspecified crime carrying a penalty of more than one year, at a certain time and place. *State* v. *Geyer,* supra, 16. Except for the defendant's inconsequential failure to inquire about where Williams was convicted, this is precisely what transpired in this case. We conclude, therefore, that the witness' admission to an unnamed felony conviction was sufficient to satisfy the constitutional standard of cross-examination under the sixth amendment.

B

The defendant next claims that he was improperly denied access to the witness' PSI. The defendant claims

that because the PSI may have contained relevant information of which he was unaware, the trial court should have granted him access to it pursuant to Practice Book § 917 (7).[7] We disagree.

"PSIs result from a presentence inquiry into the circumstances of the offenses, the attitude of the victim or his immediate family, the criminal record, social history and present condition of the defendant, and, if desirable, the mental and physical state of the defendant. . . . 'Their sole purpose is to enable the court, within the limits fixed by statute, to impose an appropriate penalty, fitting the offender as well as the crime.' *State* v. *Gullette,* 3 Conn. Cir. 153, 167, 209 A.2d 529 (1964)." *Steadwell* v. *Warden,* 186 Conn. 153, 158–59, 439 A.2d 1078 (1982). Practice Book § 917 limits access

---

[7] Although not raised by the defendant, Practice Book §§ 915 and 916 are also relevant to this issue.

Practice Book § 915 provides: "The presentence investigation report shall be provided to the judicial authority, and copies thereof shall be provided to the prosecuting authority and to the defendant or his counsel in sufficient time for them to prepare adequately for the sentencing hearing, and in any event, no less than twenty-four hours prior to the date of the sentencing. Upon request of the defendant, the sentencing hearing shall be continued for a reasonable time if the judicial authority finds that the defendant or his counsel did not receive the presentence investigation report within such time."

Practice Book § 916 provides: "The presentence investigation report and copies thereof made available under Sec. 915 shall be returned to the probation officer or delivered to the clerk immediately following the imposition of the sentence. No person shall, without the permission of the court, make or cause to be made any copy of any presentence investigation report except as authorized by Secs. 915 and 917."

Practice Book § 917 provides: "The presentence investigation report shall not be a public record and shall not be accessible to the public. It shall be available initially to the parties designated in Sec. 915 for use in the sentencing hearing and in any subsequent proceedings wherein the same conviction may be involved, and it shall be available at all times to the following . . . (7) Any court of proper jurisdiction where it is relevant to any proceeding before such court. Such court *may* also order that the report be made available to counsel for the parties for the purpose of such proceeding . . . ." (Emphasis added.)

to PSIs because they "contain personal, and possibly embarrassing, information about the defendant." *State* v. *Fair,* 197 Conn. 106, 113, 496 A.2d 461 (1985), cert. denied, 475 U.S. 1096, 106 S. Ct. 1494, 89 L. Ed. 2d 895 (1986).

Section 917 (7) provides that when a PSI is relevant to a proceeding before the trial court, such court, *may,* in its discretion, "order that the report be made available to counsel for the parties for the purpose of such proceeding." Here, the trial court exercised the discretion implicit in the use of the word "may" in § 917 (7) to protect the private and confidential nature of the PSI but still accommodated the defendant's request for information about Williams. As an alternative to allowing the defendant access to the PSI, the trial court asked the defendant what information he was looking for in the PSI. The defendant responded that he wanted to ascertain the nature of Williams' criminal record and whether conditions were placed on her probation. The trial court ordered the probation officer, whom the defendant had subpoenaed to appear in court, to meet with both counsel and to answer the defendant's questions. Defense counsel also wanted to know whether the state had offered Williams any consideration with respect to her felony sentence for testifying against the defendant. The trial court informed defense counsel that he could inquire about that on cross-examination. After the meeting with the probation officer the following exchange between the trial court and defense counsel occurred:

"The Court: . . . I just want to make sure you met, is there any problem?

"Mr. Merchant: There's no problem that arose out of the meeting. There may be some issues that we will deal with before this Court as is appropriate but the information that you ordered him to give to me was given."

Since the record discloses that the trial court provided alternate and less intrusive means of access to the information that the defendant sought, we conclude that the trial court did not abuse its discretion in denying access to the confidential document itself.

## C

Finally, the defendant claims that the trial court impermissibly limited his cross-examination concerning Williams' drug and alcohol use. The trial court restricted the cross-examination to October 21, 1988, the day of the shooting. The defendant argues that since Williams did not report to the police that she had witnessed the shooting until the next day, he should have been able to inquire about Williams' drug or alcohol usage after the day of the shooting but prior to her report to the police. From our examination of the record, it is apparent that the defendant inquired about such usage on both days and that Williams responded negatively in both instances. The dialogue at issue occurred as follows:

"Q. [Miss Williams,] have you ever used drugs?

"A. Yes.

"Q. On October 21, 1988, had you had any alcohol to drink that day?

"A. No.

"Q. Did you take any drugs that day?

"A. No.

"Q. Between, roughly, 6 o'clock or 6:10 [p.m.] or whatever on October 21st, 1988, until 5 [p.m.] October 22nd, 1988, did you take any alcohol?

"A. No.

"Q. Did you take any drugs?

"A. No."

We therefore conclude that this claim is without merit.

The judgment is affirmed.

In this opinion PETERS, C. J., SHEA and GLASS, Js., concurred.

BERDON, J., dissenting. I disagree, and would hold that the oral statements made by the defendant to Patrol Officer Paul Carlson implicating him in the murder should have been suppressed because they were taken in violation of his right to have counsel present during custodial interrogation under the fifth and fourteenth amendments to the constitution of the United States. It is now beyond debate that if the individual in custody "states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." *Miranda* v. *Arizona,* 384 U.S. 436, 474, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Although the majority reflects doubt, it is clear that the defendant had invoked his all-inclusive right to counsel *after* initially signing a waiver form by asking Lieutenant Michael Kozlowski if he could telephone his attorney, John Merchant. The police had no doubt that the defendant wanted his attorney; when Kozlowski brought the defendant to Detective Robert Kwet, he advised Kwet that the defendant had tried to contact his attorney and would like to do so again. The state had no doubt, and acknowledges as much in its brief by stating that "Kozlowski then turned the defendant over to Detective Robert Kwet and told Kwet that the

defendant had been advised of his rights and that he wanted to talk to his attorney but the line was busy." I am sure the defendant had not wished merely to pass the time of day with his attorney on the telephone.

Having unequivocally invoked his right to counsel, questioning may not be resumed without an attorney present, unless the defendant validly waives his presence by initiating "further communication, exchanges or conversations with the police." *Edwards* v. *Arizona,* 451 U.S. 477, 484–85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). This rule has been described as a " 'rigid' prophylactic rule." *Smith* v. *Illinois,* 469 U.S. 91, 95, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984). *Edwards* v. *Arizona,* supra, requires that after it is determined that the defendant invoked his right to have counsel present, the state must satisfy a two-prong test to establish a waiver. "[C]ourts may admit [the defendant's] responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith* v. *Illinois,* supra.

After the defendant was turned over to Kwet and served with the arrest warrant for murder, he initiated a conversation with Kwet and blurted out an alibi. I agree with the majority that there was a waiver with respect to his statements to Kwet concerning his alibi. That waiver satisfied both prongs of *Edwards* v. *Arizona* because the defendant initiated the discussion and there was evidence that he knowingly and intelligently waived his right to counsel.

Following the defendant's alibi statement, Kwet asked him if he would be willing to make a statement. The defendant said he was willing to talk about it, but he would not give a written statement. Thereafter, it is reasonable to assume that the defendant again requested that he be able to contact his attorney

because, as the majority admits, Kwet allowed him to telephone his attorney. The defendant, however, was unable to speak to his attorney because he was unavailable.

Judges must "give a broad, rather than a narrow, interpretation to a defendant's request for counsel . . . ." *Michigan* v. *Jackson,* 475 U.S. 625, 633, 106 S. Ct. 1404, 89 L. Ed. 2d 631 (1986); see, e.g., *United States* v. *Gotay,* 844 F.2d 971, 975–76 (2d Cir. 1988) (the defendant's statement that she could not afford an attorney but was concerned about obtaining one was an ambiguous request for counsel that precluded further questioning except those designed to clarify the ambiguity; "[s]uspects should not be forced, on the pain of losing a constitutional right, to select their words with lawyer-like precision"); *United States* v. *Fouche,* 776 F.2d 1398, 1404–1405 (9th Cir. 1985), cert. denied, 486 U.S. 1017, 108 S. Ct. 1756, 100 L. Ed. 2d 218 (1988) (the defendant's statement that he might want to speak to an attorney constituted an ambiguous request for counsel; subsequent questioning must be limited to clarifying that request); *United States* v. *Webb,* 633 F.2d 1140, 1142 (5th Cir. 1981) (the defendant's statement that he wanted to call his attorney was an ambiguous request for counsel that invoked his right to counsel). It is obvious that the defendant, for the second time, invoked his right to an attorney for all purposes. The right to the attorney may be triggered "in any manner and at any stage of the process. . . . The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Miranda* v. *Arizona,* supra, 444–45.

The defendant was then placed in a booking area cell. At about 7 p.m., Carlson was directed to obtain a state-

ment from the defendant. The defendant was brought to the detective bureau for this purpose. By sending Carlson to get a statement from the defendant after his second request for counsel, the police committed a clear violation of his right to be free of police-initiated interrogation without counsel present. *Edwards* v. *Arizona,* supra. There can be no doubt that the defendant was forced into the interview with Carlson by being taken to the detective bureau. *Edwards* v. *Arizona* was designed "to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan* v. *Harvey,* 494 U.S. 344, 350, 110 S. Ct. 1176, 108 L. Ed. 2d 293 (1990). In the recent case of *Minnick* v. *Mississippi,* 498 U.S. 146, 111 S. Ct. 486, 489, 112 L. Ed. 2d 489 (1990), the United States Supreme Court pointed out that the rule in *Edwards* v. *Arizona* gave force to the *Miranda* admonitions by making clear that once the accused invoked his right to counsel, all interrogation must cease and cannot be reinitiated by the police until counsel is present or there is a valid waiver of that right.

Even if we viewed the defendant's second request to Kwet that he be allowed to telephone his attorney as an ambiguous request for an attorney, or even if he made a mere reference to counsel, the defendant's incriminating statements to Carlson are still not admissible. Under such circumstances, "courts have held that all questioning must cease upon any request for or reference to counsel, however equivocal or ambiguous." *Smith* v. *Illinois,* supra, 96 n.3. Others have held "that when an accused makes an equivocal statement that 'arguably' can be construed as a request for counsel, all interrogation must immediately cease except for narrow questions designed to 'clarify' the earlier statement and the accused's desires respecting counsel. See, e.g., *Thompson* v. *Wainwright,* 601 F.2d 768, 771–772 [5th Cir. 1979]; *State* v. *Moulds,* 105 Idaho 880, 888,

673 P.2d 1074, 1082 (App. 1983)." *Smith* v. *Illinois,* supra, 96 n.3.[1] In the present case, the state satisfied neither approach. The police did not cease all questioning nor did they attempt to clarify the defendant's prior request for counsel; rather, Carlson was specifically sent to get a statement from the defendant. It is constitutionally insufficient to merely "re-Mirandize" the defendant and ask him whether he wants to make a statement. The United States Supreme Court has construed, just as we should, that "the defendant's request for counsel [is] an extremely important fact in considering the validity of a subsequent waiver in response to police-initiated interrogation." *Michigan* v. *Jackson,* supra, 633 n.6.

In this case, *Connecticut* v. *Barrett,* 479 U.S. 523, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987), cannot transform the defendant's words into a waiver to satisfy the *Edwards'* rule. First, we do not reach a *Barrett* type statement—that is, I will answer your questions but will not sign a statement. The defendant's invocation of his right to counsel to Kwet canceled any *Barrett* waiver given to Kwet.

Second, the *Barrett* analysis is not applicable to this case. Although the defendant indicated to Kwet that

---

[1] A third approach, which even if accepted, would not lead to a different result. "Others have attempted to define a threshold standard of clarity for such requests, and have held that requests falling below this threshold do not trigger the right to counsel. See, e.g., *People* v. *Krueger,* 82 Ill. 2d 305, 311, 412 N.E.2d 537, 540 (1980) ('[a]n assertion of the right to counsel need not be explicit, unequivocal, or made with unmistakable clarity,' but not 'every reference to an attorney, no matter how vague, indecisive or ambiguous, should constitute an invocation of the right to counsel'), cert. denied, 451 U.S. 1019, [101 S. Ct. 3009, 69 L. Ed. 2d 390] (1981)." *Smith* v. *Illinois,* 469 U.S. 91, 96 n.3, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984). The Supreme Court of the United States has not yet resolved the conflict between these rules; but it would seem that to give full force to the right to counsel would require all doubts be resolved in favor of the accused. See *Minnick* v. *Mississippi,* 498 U.S. 146, 111 S. Ct. 486, 491, 112 L. Ed. 2d 489 (1990).

he was willing to give a *Barrett* type statement, that response must be viewed in the context of his general all-inclusive request before Kozlowski to have counsel present and his subsequent request for counsel to Kwet. At best, the *Barrett* response after the defendant asked for counsel or attempted to contact his attorney made it an ambiguous response implicating his right to counsel, which required the police to limit themselves to questions that clarified the request, if not cease all interrogation. In determining whether there was a waiver, the equivocal words and actions preceding the purported request for counsel, as well as those that are part of the purported request, must be taken into account. See *Smith* v. *Illinois,* supra, 96. In *Barrett,* there was no such attempt to contact counsel, but merely a response by the defendant that he would not give a written statement without counsel.[2] The majority of the United States Supreme Court in *Barrett* emphasized this distinction when it pointed out that there was no suggestion in the facts that the request for counsel was "all-inclusive." *Connecticut* v. *Barrett,* supra, 479 U.S. 527 n.1.

Third, even if the *Barrett* response made to Carlson could be considered, reliance upon it is flawed in the same manner as is the *Barrett* response made to Kwet; it must be reviewed in the context of the prior request or references to counsel made by the defendant. See *Smith* v. *Illinois,* supra.

In our overburdened system of justice, we sometimes lose sight of the reasons for the rules that implement

---

[2] I am aware that in *State* v. *Barrett,* 197 Conn. 50, 56, 495 A.2d 1044 (1985), there is an indication the defendant attempted to contact counsel. Nevertheless, when charting the limits of the *Barrett* rule adopted by the United States Supreme Court in *Connecticut* v. *Barrett,* 479 U.S. 523, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987), we must look at the predicate facts considered by that court and not extraneous matters considered by other courts.

constitutional guarantees, such as the right to counsel and the privilege against self-incrimination. We probably all should periodically reread *Miranda* v. *Arizona*. Chief Justice Earl Warren quoted in *Miranda* the case of *Brown* v. *Walker*, 161 U.S. 591, 16 S. Ct. 644, 40 L. Ed. 819 (1896), as follows: " 'The maxim *nemo tenetur seipsum accusare* [no one shall be compelled to accuse himself] had its origin in a protest against the inquisitorial and manifestly unjust methods of interrogating accused persons, which [have] long obtained in the continental system, and, until the expulsion of the Stuarts from the British throne in 1688, and the erection of additional barriers for the protection of the people against the exercise of arbitrary power, [were] not uncommon even in England. While the admissions or confessions of the prisoner, when voluntarily and freely made, have always ranked high in the scale of incriminating evidence, if an accused person be asked to explain his apparent connection with a crime under investigation, the ease with which the questions put to him may assume an inquisitorial character, the temptation to press the witness unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions, which is so painfully evident in many of the earlier state trials, notably in those of Sir Nicholas Throckmorton, and Udal, the Puritan minister, made the system so odious as to give rise to a demand for its total abolition. The change in the English criminal procedure in that particular seems to be founded upon no statute and no judicial opinion, but upon a general and silent acquiescence of the courts in a popular demand. But, however adopted, it has become firmly embedded in English, as well as in American jurisprudence. So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States, with one accord, made a denial of the right to question an

accused person a part of their fundamental law, so that a maxim, which in England was a mere rule of evidence, became clothed in this country with the impregnability of a constitutional enactment.' *Brown* v. *Walker,* 161 U.S. 591, 596–97 (1896)." *Miranda* v. *Arizona,* supra, 442–43.

Modern day practices of interrogation, which place heavy psychological pressure upon the person while he or she is in isolation and unfamiliar surroundings, "exacts a heavy toll on individual liberty and trades on the weakness of individuals." Id., 455. Accordingly, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Id., 475. The state has not met this burden relative to the statements made by the defendant to Carlson.

I would hold that the statement obtained by Carlson violated the defendant's fifth and fourteenth amendment rights and that the statement should have been suppressed. I would set the judgment aside and order a new trial. Accordingly, I respectfully dissent.