## STATE OF CONNECTICUT *v.* RUSSELL KIRBY
## (SC 17531)

Sullivan, C. J., and Borden, Norcott, Palmer and Zarella, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

 

Argued January 5—officially released October 17, 2006

*Jeremiah Donovan,* for the appellant (defendant).

*Kevin T. Kane,* state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. This appeal requires us to consider whether various hearsay statements made by the deceased complainant to a police dispatcher, a

responding police officer, and an emergency medical technician were "testimonial" and, therefore, inadmissible as violative of the confrontation clause of the sixth amendment to the United States constitution[1] as explained by *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The defendant, Russell Kirby, appeals[2] from the judgment of conviction, rendered after a jury trial, of one count of kidnapping in the second degree in violation of General Statutes § 53a-94,[3] and one count of assault in the third degree in violation of General Statutes § 53a-61.[4] In addition to raising the *Crawford* and associated evidentiary issues, specifically whether the deceased complainant's statements to the police officer and dispatcher were "spontaneous utterances," the defendant also contends that the trial court improperly denied his motions: (1) to suppress statements that he had made to the police at his residence and at the police station; and (2) for

[1] "The sixth amendment to the United States constitution provides in relevant part: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .' The confrontation clause of the sixth amendment is made applicable to the states through the due process clause of the fourteenth amendment." *State* v. *Sandoval*, 263 Conn. 524, 532 n.17, 821 A.2d 247 (2003).

[2] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] General Statutes § 53a-94 provides: "(a) A person is guilty of kidnapping in the second degree when he abducts another person.

"(b) Kidnapping in the second degree is a class B felony for which three years of the sentence imposed may not be suspended or reduced by the court."

[4] General Statutes § 53a-61 provides: "(a) A person is guilty of assault in the third degree when: (1) With intent to cause physical injury to another person, he causes such injury to such person or to a third person; or (2) he recklessly causes serious physical injury to another person; or (3) with criminal negligence, he causes physical injury to another person by means of a deadly weapon, a dangerous instrument or an electronic defense weapon.

"(b) Assault in the third degree is a class A misdemeanor and any person found guilty under subdivision (3) of subsection (a) of this section shall be sentenced to a term of imprisonment of one year which may not be suspended or reduced."

judgment of acquittal based on the trial court's failure to order the state to move for the grant of immunity for a witness pursuant to General Statutes § 54-47a. Guided by the United States Supreme Court's recent decision in *Davis* v. *Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), we reverse the judgment of the trial court and remand the case for a new trial.

The record reveals the following facts and procedural history. On the evening of May 2, 2002, Leslie Buck (complainant), a fifty-nine year old second grade teacher, attended a meeting of Alpha Delta Kappa, an honorary sorority for teachers. After the meeting ended at approximately 8:15 p.m., the complainant left the meeting and drove home, intending to stop first at her mother's house to drop off some dessert from the meeting. Later that evening, at approximately 10:45 p.m., Charles Buck, the complainant's husband, called Judy Barber, a close friend of the complainant who also had attended the sorority meeting, and asked about the complainant's whereabouts. Barber did not know where the complainant was at that time.

Buck previously had called the Stonington police at approximately 10:30 p.m., to report the complainant missing.[5] Timothy Thornton, a Stonington police officer, responded to Buck's home and took a report from him. After Thornton spoke to Buck, as well as to Barber, he drove to the nearby A & P supermarket on the chance that the complainant might have stopped there on her way home. While Thornton was at the A & P, the complainant returned home; Buck notified the police of her return via telephone at 11:07 p.m. The complainant then interjected in Buck's conversation with Allyson Gomes,

---

[5] Buck was called to testify at trial, but invoked his fifth amendment privilege against self-incrimination in response to every question asked during both the pretrial hearings and the trial itself, outside the presence of the jury. See part III of this opinion.

the police dispatcher, and told Gomes that the defendant had surprised her when she arrived home, and then assaulted and abducted her before she was able to escape.[6] Gomes then dispatched Thornton back to Buck's residence, where he interviewed the complain-

---

[6] We note the following transcript of the tape recording of the conversation between Gomes, Buck and the complainant. The call was received by the Stonington police at 23:07:52 on Thursday, May 2, 2002, and provided as follows:

"[The Complainant]: (Screaming in the background.)

"[Gomes]: Stonington Police Dispatcher Gomes.

"[Buck]: Hello?

"[Gomes]: Stonington Police Department.

"[Buck]: Yeah, Charlie Buck, my wife just came home, she said she was kidnapped!

"[The Complainant]: By [the defendant]! Oh my God!

"[Gomes]: Any description?

"[Buck]: Oh Sweetheart.

"[The Complainant]: Look at me!

"[Buck]: Oh!

"[Gomes]: Is she injured?

"[The Complainant]: He's so sick!

"[Buck]: Hello?

"[Gomes]: Sir?

"[Buck]: Yeah, Thornton was just here.

"[The Complainant]: Oooooh!

"[Buck]: My wife is . . . sweetheart I'm talking.

"[Gomes]: Sir?

"[Buck]: There here get Thornton back here will ya please?

"[Gomes]: The officer there?

"[Buck]: Yeah.

"[Buck]: Ohhhhh . . . oh sweetie.

"[Buck]: Are you . . . there?

"[The Complainant]: I've been bound up!

"[Buck]: Oh god!

"[The Complainant]: I told you I never liked him!

"[Buck]: Nu-huh.

"[Buck]: Hello?

"[Gomes]: Sir, calm down a moment.

"[Buck]: Oh my wife is up here, she's a mess here.

"[Gomes]: Any description of the people who did this?

"[Buck]: She knows who it is she said. She's getting on the phone.

"[The Complainant]: Hello, I just, I came home and this person, a friend of my husband's was in the garage, I think he had a stun gun, he grabbed me by the neck, he kept pulling me, he pushed me down, then he finally,

ant, whom he found near hysterical and disheveled, but

he tied my hands [and] feet when he took me to his house on where is it? . . . Lantern Hill?

"[Buck]: Yup.

"[Gomes]: Okay, what is his name?

"[The Complainant]: He punched me in the stomach, and I tried to pull away and finally we've been driving around in the car and he just stopped on [Interstate] 95 and he had the keys with him, he has our house keys!

"[Buck]: Oh God!

"[Gomes]: Okay, ma'am? Ma'am?

"[The Complainant]: Yes.

"[Gomes]: Listen to me, what was his name please?

"[The Complainant]: [The defendant]. He's about [sixty-five] years old, he stopped on [Interstate] 95 in between Mystic.

"[Gomes]: In your car?

"[The Complainant]: In my car.

"[Gomes]: And he has your car?

"[The Complainant]: He, no, I have the car.

"[Gomes]: Okay.

"[The Complainant]: He untied me. I have an extra key in my pocketbook. I, during the night I got it out and had it in my hand, when he got out of the car to check something, I just shut the door, shoved that in and drove like crazy home here.

"[Buck]: Ohhhhhh.

"[Gomes]: Okay, stay on the phone.

"[The Complainant]: What?

"[Gomes]: Go ahead, Tack 3.

"[The Complainant]: I don't know what they're saying to me?

"[Gomes]: Do you need an ambulance there?

"[The Complainant]: No.

"[Gomes]: Okay.

"[The Complainant]: I don't think so, but I got bad chest pains.

"[Buck]: Oh sweetheart.

"[The Complainant]: What?

"[Gomes]: Talking with officer in the car, the suspect that abducted her is [the defendant], says he's on [Interstate] 95 right now.

"[The Complainant]: And he's on [Interstate] 95 at least he was, in between Allyn Street near the Mystic exit.

"[Gomes]: Talking to officer, near the Mystic exit. She's home, has her vehicle, but he has a set of spare keys with him.

"[The Complainant]: Got mom's keys.

"[Buck]: Ohhhh. I don't know what is the problem he was just here and took all the information. I showed him a picture of her.

"[Gomes]: He's on Mason's Island right now.

"[Buck]: Okay.

"[The Complainant]: I think my thumb's broken.

coherent.[7] Thornton then called for medical assistance at that time. After Thornton interviewed the complainant, she was assessed and transported to a hospital by Jeremy Knapp, a volunteer emergency medical technician, and his ambulance crew.[8]

The complainant's statements during her interview with Thornton and telephone call to Gomes, introduced

"[Gomes]: He should be there any minute.

"[Buck]: Okay, oh no.

"[Gomes]: What is [the defendant's] address on Lantern Hill, do you know?

"[The Complainant]: I don't know.

"[Buck]: I don't know.

"[Gomes]: You don't know?

"[Buck]: No. . . .

"[Gomes]: What was he wearing?

"[The Complainant]: What?

"[Gomes]: What was he wearing, ma'am?

"[The Complainant]: He had on I think corduroy pants and a plaid shirt and he has on a toupee. He had on brown shoes.

"[Gomes]: He had white . . . ?

"[The Complainant]: He's got a lot of his stuff in the back of my car. I don't even know what it is.

"[Gomes]: Roger, the officer is there right now.

"[The Complainant]: Okay.

"[Buck]: Alright.

"[Gomes]: Okay.

"[Buck]: Yup.

"[Gomes]: Wait til he makes contact with you.

"[The Complainant]: What?

"[Gomes]: Let me know when he's there.

"[The Complainant]: What time did you get home?

"[Buck]: Oh, about five after ten, I called, called Anna right away and she didn't see you then I called Judy, then Judy said you left about quarter past eight. Oh, oh, you poor thing, your hand is cut oh God, oh God!

"[The Complainant]: Alright, goodbye. (Hangs up.)"

[7] Thornton testified that the complainant appeared as if she had been in a scuffle because her hair was in disarray, her stockings were ripped and she had black marks under her eyes.

[8] Knapp testified that he interviewed the complainant about what had happened in connection with his medical assessment of her. The complainant appeared shaking and upset to him, and also told him that she had been kidnapped and tied up for several hours. Knapp assessed the complainant as having injuries to her hands and shoulder, and she complained of chest and abdominal pain as well.

into evidence through Thornton's testimony and the tape recording of the telephone call, develop in greater detail the altercation between the complainant and the defendant as follows. When the complainant arrived home from the meeting, she heard someone call her name. When she turned toward the voice, an individual that she had identified as the defendant struck her on the head and neck with a black object that made a humming noise. She then scuffled with the defendant, who tied her up. The complainant was able to extricate herself at first, but the defendant chased and tackled her again, tying her up more securely the second time. The defendant then put the complainant in her car, a Buick Park Avenue, and threw a bag into the backseat before driving away with her to his residence.

Subsequently, while the defendant and the complainant drove around in her car, he pulled over to the side of the road and untied her. The defendant then pulled over again on Interstate 95 in Mystic because he thought he had hit something after hearing a thumping noise. After the defendant exited the car to check the source of the noise, the complainant, whose hands previously had been untied, was able to use a spare key in her pocket to start the car and drive off, leaving the defendant on the side of the highway. The complainant then drove the car to her home, at which point Buck called the police to tell them that she had returned.

Once the complainant had been transported to the hospital, Thornton and several other police officers, including Sergeant Keith Beebe, met to discuss the case. They subsequently decided to go to the defendant's home to discuss the case with him. When the police arrived at the defendant's home in Ledyard at 4:30 a.m. on May 3, 2002, they knocked on his door. The defendant declined their requests to step outside, but invited the police officers into the house. While in the house, the officers noticed, on the kitchen counter, a key ring

that was readily identifiable as belonging to the complainant because she previously had described its emblems and accessories to the officers; they seized those keys. In response to Beebe's question about whether the defendant knew why the police were there, the defendant first said yes, and when asked about whether it was about the complainant, he said yes again. The defendant then admitted to the officers that he had tied up the complainant as part of kidnapping her for money, and asked whether he would be coming with the officers. The defendant was then taken into custody.

Subsequently, David Knowles, a detective sergeant with the Stonington police department, searched the complainant's automobile. He found a duffel bag belonging to the defendant in the backseat containing a .45 caliber handgun and a magazine with seven live rounds, two stun guns, one of which was functional, two plastic bottles of liquid, which turned out to be a chopped olive martini, a hickory log, several ropes, two pairs of men's eyeglasses, and one pair of women's eyeglasses that a local optician subsequently identified as belonging to the complainant. The bag also contained several bandannas and white cotton gloves that were similar to other bandannas and gloves that the police had found on a dresser in the defendant's residence.[9]

---

[9] The defendant testified at trial that he supplemented his Electric Boat pension by working in numerous handyman and mechanic positions. He became very friendly with Buck when he began to do work for Buck's electrical contracting business, and subsequently worked for Buck as a mechanic for his antique cars. In that capacity, he had free access to the garage at Buck's home and the tools kept therein.

The defendant also testified that, on May 2, 2002, which was a rainy night, he was having mechanical difficulties starting his pickup truck, and went to Buck's house to borrow truck parts and tools from the garage. He testified that the complainant arrived home and found him in the garage, and then, because she was angry at him because Buck had paid him with joint funds, attacked him with her pocketbook and large key ring. He then wrestled her and used the stun gun on her in self-defense. He then tied up the complainant and put her in her car in order to go find Buck, who was out at a bar, to settle the issue; he placed his bag in the car. The defendant testified that he did not call the police because he did not want to embarrass his friend's

Early in the morning of May 3, 2002, the complainant called Barber, and told her what had happened to her. The complainant then went and worked a full day at school. That evening, after Thornton had stopped by the complainant's home to check on her, the complainant died as a result of a fall down a flight of stairs at her home.

Thereafter, the state charged the defendant with one count of kidnapping in the second degree in violation of § 53a-94, two counts of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1) and (2), and one count of assault in the third degree in violation of § 53a-61. The defendant then moved in limine to exclude the complainant's statements to Thornton, Gomes and Knapp as inadmissible hearsay that also would violate the defendant's confrontation clause rights. The defendant also moved to suppress statements that he made to the police after his arrest, as well as the keys that the police had seized from his residence. The trial court denied these motions in two extensive oral decisions. The case was then tried to the jury, and the trial court rendered judgment of conviction in accordance with the verdict of guilty on the kidnapping and assault charges. After denying the defendant's motions for a judgment of acquittal and a new trial, the trial court sentenced the defendant to a total effective

---

wife. The defendant then testified that he drove the complainant back to his house in Ledyard to get more truck parts, where he unbound her when she calmed down. They then headed back to Stonington on Interstate 95, at which point he pulled over to check the thumping noise and the complainant escaped using her spare key.

The defendant then testified that he had a reason for each of the items in the duffel bag. He testified that he had altercations with vicious Rottweilers at a different job, and he intended to use the martini to drug them and the gun to protect himself if necessary. The log and ropes were intended for leverage for lifting heavy items at that site. The stun gun was going to be used to start his pickup truck, which had electrical problems. Finally, the gloves were intended to alleviate symptoms of the defendant's carpal tunnel syndrome.

sentence of twenty-one years imprisonment, three of which are nonsuspendable.[10] This appeal followed.

## I

## WHETHER THE COMPLAINANT'S STATEMENTS TO GOMES, THORNTON AND KNAPP WERE PROPERLY ADMITTED INTO EVIDENCE

The primary issue in this appeal is whether the trial court properly admitted into evidence the complainant's statements to Gomes, the police dispatcher who received the telephone call, Thornton, the police officer who initially responded to the call and interviewed the complainant, and Knapp, the emergency medical technician who treated and transported her. The trial court denied the defendant's motions in limine to preclude the admission of those statements, rejecting his claims that the statements: (1) were not "spontaneous utterances" admissible under § 8-3 (2) of the Connecticut Code of Evidence; and (2) were "testimonial" and, therefore, inadmissible under *Crawford* v. *Washington*, supra, 541 U.S. 36. We note at the outset that it is undisputed that the defendant properly preserved all of these issues for appellate review when he filed relevant motions in limine, objected again at trial, and reiterated his objection in his motion for a new trial. We begin with the defendant's evidentiary claims.[11]

---

[10] The trial court sentenced the defendant to twenty years imprisonment, three of which are nonsuspendable, on the kidnapping count. With respect to the assault charge, the trial court imposed a sentence of one year imprisonment, consecutive to the kidnapping sentence.

[11] We note that the defendant does not contest, on evidentiary grounds, the admission of the complainant's statements to Knapp pursuant to the medical treatment exception to the hearsay rule. See Conn. Code Evid. § 8-3 (5).

## A

### Whether the Complainant's Statements to Gomes and Thornton Were Spontaneous Utterances

The defendant first claims that the trial court improperly admitted the statements to Thornton and Gomes as spontaneous utterances under § 8-3 (2) of the Connecticut Code of Evidence. Specifically, the defendant notes that the complainant made her statements to Thornton and Gomes two and one-half to three hours after she initially had arrived home from the sorority meeting to find the defendant in her garage, and contends that lapse of time and the fact that the complainant was able to drive home created an opportunity for fabrication that rendered these statements inadmissible as spontaneous utterances. The state argues in response that the trial court did not abuse its discretion in determining that the statements were admissible because less than thirty minutes had passed since she had escaped from the defendant, and that both the telephone call tape recording and the witnesses' testimony demonstrated that those statements were made while she was still extremely emotional and fearful. We agree with the state.

"An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies." (Internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 127, 763 A.2d 1 (2000). Section 8-3 of the Connecticut Code of Evidence provides that certain statements are "not excluded by the hearsay rule, even though the declarant is available as a witness . . . ." A "spontaneous utterance" is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Conn. Code Evid. § 8-3 (2). Furthermore, the commentary to § 8-3 (2)

provides: "The hearsay exception for spontaneous utterances is well established. . . . Although [§] 8-3 (2) states the exception in terms different from that of the case law on which the exception is based . . . the rule assumes incorporation of the case law principles under-lying the exception.

"The event or condition must be sufficiently startling, so 'as to produce nervous excitement in the declarant and render [the declarant's] utterances spontaneous and unreflective.' " (Citations omitted.)

"The excited utterance exception is well established. Hearsay statements, otherwise inadmissible, may be admitted into evidence to prove the truth of the matter asserted therein when (1) the declaration follows a startling occurrence, (2) the declaration refers to that occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrica-tion by the declarant. . . .

"The requirement that a spontaneous utterance be made under such circumstances as to [negate] the opportunity for deliberation and fabrication by the declarant . . . does not preclude the admission of statements made after a startling occurrence as long as the statement is made under the stress of that occur-rence. . . . While [a] short time between the incident and the statement is important, it is not dispositive. . . .

"Whether an utterance is spontaneous and made under circumstances that would preclude contrivance and misrepresentation is a preliminary question of fact to be decided by the trial judge. . . . The trial court has broad discretion in making that factual determination, which will not be disturbed on appeal absent an unrea-sonable exercise of discretion. . . . Furthermore, although the time period between the occurrence and

the utterance is important, it is *not* dispositive."[12] (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Kelly*, 256 Conn. 23, 41–42, 770 A.2d 908 (2001); id., 41 (sexual assault victim's statement made to sister while victim was hysterical and in fetal position, fifteen minutes after arriving home from altercation, properly admitted as spontaneous utterance).

Thus, we follow the rule embraced by the "majority of the jurisdictions that have addressed the issue of the effect of the time interval between the startling occurrence and the making of the spontaneous utterance," and conclude that there is no identifiable discrete time interval within which an utterance becomes spontaneous; "[e]ach case must be decided on its particular circumstances." *State* v. *Stange*, 212 Conn. 612, 618, 563 A.2d 681 (1989); id., 618–20 (collecting cases reflecting acceptable time lapses ranging from fifteen minutes to six and one-half hours and upholding victim's statement made fifteen to thirty minutes after shooting as victim was witnessed in "agitated and painful state"); see also *State* v. *Arluk*, 75 Conn. App. 181, 188–90, 815 A.2d 694 (2003) (thirty minutes not excessive time between family fight and child blurting out to police officer that he saw "daddy hit his mommy" when child was still under stress of having witnessed that altercation [internal quotation marks omitted]); cf. *State* v. *Gregory C.*, 94 Conn. App. 759, 771–72, 893 A.2d 912 (2006) (State-

---

[12] This represents an evolution from the "traditional" approach formerly followed by his court, under which there was "a very narrow time frame within which a spontaneous utterance could arise. *Rock[hill]* v. *White Line Bus Co.*, 109 Conn. 706, 710, 145 A. 504 (1929) (three minutes too long); *Perry* v. *Haritos*, [100 Conn. 476, 483, 124 A. 44 (1924)] (utterance permitted where made in such close proximity to accident as to be almost part of and contemporaneous with it). The presence or absence of a very brief time frame between the event and the spontaneous utterance was 'decisive.' " *State* v. *McNair*, 54 Conn. App. 807, 812, 738 A.2d 689, cert. denied, 251 Conn. 913, 739 A.2d 1249 (1999).

ments of the victim made to a police officer were not spontaneous utterances when "more than fifteen hours had passed between the time of the alleged sexual assault and the victim's statement to [an investigating police officer]. Further, the victim discussed her alleged assault at length with [her friend] prior to giving her statement. The victim thus had considerable time and opportunity to collect her thoughts and reflect on what had occurred the night before."); *State* v. *McNair*, 54 Conn. App. 807, 813, 738 A.2d 689 (noting that when "significant time lapse was allowed" for spontaneous utterance, "the declarant had undergone drastic personal trauma and remained in a severe emotional state from the time of the event until the time of the statement"), cert. denied, 251 Conn. 913, 739 A.2d 1249 (1999). Moreover, that a statement is made in response to a question does not preclude its admission as a spontaneous utterance. See *State* v. *Stange*, supra, 619.

We conclude that the trial court did not abuse its broad discretion in determining that the complainant's statements to Thornton and Gomes were admissible as spontaneous utterances pursuant to § 8-3 (2) of the Connecticut Code of Evidence. As the Appellate Court has recognized, "the application of the exception entails a uniquely fact-bound inquiry. The overarching consideration is whether the declarant made the statement before he or she had the opportunity to undertake a reasoned reflection of the event described therein." *State* v. *Westberry*, 68 Conn. App. 622, 628, 792 A.2d 154, cert. denied, 260 Conn. 923, 797 A.2d 519 (2002). In the present case, it is undisputed that the complainant's statements followed a startling occurrence, namely, her altercation with the defendant, and that the complainant both observed and referred to that occurrence. With respect to the fourth element, as the defendant himself states, "[t]here can be no doubt that the trial court found correctly that [the complainant] sounded highly

emotional when she spoke with [Gomes], [Thornton] and [Knapp]."[13] Moreover, all of the statements at issue were made within one-half hour of the complainant having arrived home from her multihour altercation with the defendant, which our cases indicate is not an excessive time lapse for purposes of avoiding contrivance or fabrication by an alleged victim. See, e.g., *State v. Stange*, supra, 212 Conn. 618–20; cf. *State v. McNair*, supra, 54 Conn. App. 813 (Trial court improperly admitted a statement made after a one-half hour time lapse when the declarant "was not the actual or intended victim, or even a close bystander. The witness viewed the incident from the safety of her apartment. The thirty minute intervening period gave the witness ample time to collect her thoughts before making the statements at issue." [Internal quotation marks omitted.]). There also is no evidence that the complainant had the opportunity to speak to anyone else prior to making the statements, which would indicate the opportunity to reflect or contrive a story. See *State v. Gregory C.*, supra, 94 Conn. App. 771–72. "The conclusion that evidence is admissible under a hearsay exception does not preclude the possibility, in a criminal trial, that the same evidence will be inadmissible under the confrontation clause of the sixth amendment. The confrontation clause limits the state's use of hearsay evidence against a criminal defendant at trial." *State v. Smith*, 275 Conn. 205, 232, 881 A.2d 160 (2005). Accordingly, we now turn to the

---

[13] The defendant contends that the statements were inadmissible under the spontaneous utterance exception because the complainant's time driving with the defendant and then driving home after leaving him on the side of the road left her ample time to "reflect upon what she should say in order to explain her own actions, get [the defendant] into serious trouble, and rid her husband of his companionship . . . ." The defendant further argues that "[e]motion . . . is no indicia of trustworthiness," and adds that "the distorting power of shock, fear and excitement cannot be underestimated." These arguments go, however, to the weight afforded to the complainant's statements, and does not necessarily serve to undermine the trial court's determination as to their admissibility.

constitutional issues presented by this case concerning the admissibility of the complainant's statements.

### B

### *Crawford* Issues with Respect to Gomes and Thornton

The defendant next claims that the trial court improperly admitted into evidence the complainant's statements made via telephone to Gomes and on the scene to Thornton. The defendant claims specifically that these statements are inadmissible under the United States Supreme Court's recent decision in *Davis* v. *Washington*, supra, 547 U.S. 813, which provides greater explication of the application of that court's decision in *Crawford* v. *Washington*, supra, 541 U.S. 36, in these contexts.[14]

We first note the standard of review applicable to the trial court's determination of whether a statement is testimonial and, therefore, subject to the admissibility restrictions of *Crawford*. Because this is a question of constitutional law, we agree with the parties that the trial court's determination is subject to plenary review. Cf. *State* v. *Merriam*, 264 Conn. 617, 640–41 n.27, 835 A.2d 895 (2003) (following plurality opinion in *Lilly* v. *Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 [1999], and "conduct[ing] an independent review of the circumstances surrounding the victim's statements in determining whether those statements possess the particularized guarantees of trustworthiness that are necessary to satisfy the requirements of the confrontation clause"); see also *Wall* v. *State*, 184 S.W.3d 730,

---

[14] The present case was briefed and argued prior to the June 19, 2006 release of the United States Supreme Court decision in *Davis* v. *Washington*, supra, 547 U.S. 813. On June 22, 2006, to afford the parties the opportunity to address the import of *Davis*, we ordered them to file simultaneous supplemental briefs addressing the question of whether the trial court properly admitted into evidence the complainant's statements to Gomes and Thornton, in light of the United States Supreme Court's recent decision in *Davis*.

742–43 (Tex. Crim. App. 2006) ("Although we defer to a trial court's determination of historical facts and credibility, we review a constitutional legal ruling, i.e. whether a statement is testimonial or non-testimonial, de novo. This is particularly so because the legal ruling of whether a statement is testimonial under *Crawford* is determined by the standard of an objectively reasonable declarant standing in the shoes of the actual declarant. On that question trial judges are no better equipped than are appellate judges, and the ruling itself does not depend upon demeanor, credibility, or other criteria peculiar to personal observation.").

"Traditionally, for purposes of the confrontation clause, all hearsay statements were admissible [under *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980)] if (1) the declarant was unavailable to testify, and (2) the statement bore adequate indicia of reliability. . . . [In *Crawford* v. *Washington*, supra, 541 U.S. 68], the United States Supreme Court overruled *Roberts* to the extent that it applied to testimonial hearsay statements. . . . In *Crawford*, the court concluded that the reliability standard set forth in the second prong of the *Roberts* test is too amorphous to prevent adequately the improper admission of core testimonial statements that the [c]onfrontation [c]lause plainly meant to exclude. . . . The court held, therefore, that such testimonial hearsay statements may be admitted as evidence against an accused at a criminal trial only when (1) the declarant is unavailable to testify, and (2) the defendant has had a prior opportunity to cross-examine the declarant. . . .

"In so concluding, the court drew a distinction between testimonial hearsay statements and those deemed nontestimonial. Where nontestimonial hearsay is at issue, it is wholly consistent with the [f]ramers' design to afford the [s]tates flexibility in their development of hearsay law—as does *Roberts*, and as would

an approach that exempted such statements from [c]onfrontation [c]lause scrutiny altogether. . . . In other words, nontestimonial hearsay statements may still be admitted as evidence against an accused in a criminal trial if it satisfies both prongs of the *Roberts* test, irrespective of whether the defendant has had a prior opportunity to cross-examine the declarant.

"Although the court declined to define the terms testimonial and nontestimonial, it considered three formulations of th[e] core class of testimonial statements . . . . The first formulation consists of ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . . The second formulation consists of extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . . Finally, the third formulation consists of statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . . The court did not adopt any one particular formulation, noting that, [t]hese formulations all share a common nucleus and then define the [c]lause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, ex parte testimony at a preliminary hearing. . . . Similarly, [s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard. . . . Therefore, [w]hatever else the term [testimonial] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the

abuses at which the [c]onfrontation [c]lause was directed." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera*, 268 Conn. 351, 362–64, 844 A.2d 191 (2004).

The Supreme Court recently considered the applicability of *Crawford* to more informal statements made to police dispatchers in the context of 911 calls, and to police officers on the scene of a crime. In *Davis* v. *Washington*, supra, 547 U.S. 813, the court articulated the following test for determining whether such statements are testimonial and, therefore, inadmissible under *Crawford* in the absence of a prior opportunity for cross-examination by the defendant: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Id., 822.

The court then applied this test to the facts of the two cases before it.[15] The court first assumed that 911 operators are agents of the police, and concluded that the recording of the 911 call in that case was not testimonial hearsay because the declarant, a domestic violence victim calling to report that her former boyfriend was at her house beating her, "was speaking about events *as they were actually happening*, rather than 'describ[ing] past events . . . .' Moreover, any reasonable listener

---

[15] *Davis* is a consolidated opinion resolving two cases to which the Supreme Court granted certiorari, specifically, *Hammon* v. *Indiana*, 829 N.E.2d 444 (Ind.) (addressing on-scene statements to police officers), cert. granted, 546 U.S. 976, 126 S. Ct. 552, 163 L. Ed. 2d 459 (2005), and *State* v. *Davis*, 154 Wash. 2d 291, 111 P.3d 844 (involving statements to 911 operators), cert. granted, 546 U.S. 975, 126 S. Ct. 547, 163 L. Ed. 2d 459 (2005).

would recognize that [the caller] . . . was facing an ongoing emergency. Although one *might* call 911 to provide a narrative report of a crime absent any imminent danger, [the victim's] call was plainly a call for help against bona fide physical threat. Third, the nature of what was asked and answered . . . objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past. This is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon." (Citation omitted; emphasis in original.) Id., 827. Ultimately, the Supreme Court concluded that, "the circumstances of the [caller's] interrogation objectively indicate its primary purpose was to enable police assistance to meet an *ongoing* emergency." (Emphasis added.) Id., 828. The court did, however, note that a call for help could evolve into testimonial statements once the purpose of the emergency call has been achieved, such as after the emergency has been averted by, for example, the departure of the perpetrator from the scene. It left to trial courts, through in limine procedure, to "redact or exclude the portions of any statement that have become testimonial . . . ." Id., 829.

With respect to the on-scene statements by a domestic violence victim to a police officer, the Supreme Court concluded that the statements before it were testimonial, despite the fact that they were not the formal police station interviews with *Miranda* warnings initially contemplated in *Crawford*. Id. The court used its "primary purpose" test to hold that these statements were testimonial because it "is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct . . . . There was no emergency in progress; the interrogating officer testified that he had heard no arguments or

crashing and saw no one throw or break anything
. . . ." (Citation omitted.) Id. The court noted that the
officer's questioning was directed not at seeking "to
determine . . . 'what is happening,' but rather 'what
happened.' Objectively viewed, the primary, if not
indeed the sole, purpose of the interrogation was to
investigate a possible crime—which is, of course, pre-
cisely what the officer should have done."[16] Id., 830.
The court did, however, state that it is not impossible
that "questions at the scene will yield nontestimonial
answers," as officers might need to make initial inquir-
ies to assess the danger level of the situation. Id., 832.
The court also emphasized that, "in cases like this one,
where [the victim's] statements were neither a cry for
help nor the provision of information enabling officers
immediately to end a threatening situation, the fact that
they were given at an alleged crime scene and were
'initial inquiries' is immaterial." Id.

1

Applying the *Davis* test to the facts of the present
case, we first conclude that the complainant's state-
ments by telephone to Gomes were testimonial and,
therefore, inadmissible under *Crawford*. A review of
Gomes' conversation with the complainant makes clear
that the "primary purpose" of the call was to investigate

---

[16] We note that the United States Supreme Court emphasized that, "[p]olice
investigations themselves are, of course, in no way impugned by [its] charac-
terization of their fruits as testimonial. Investigations of past crimes prevent
future harms and lead to necessary arrests. While prosecutors may hope
that inculpatory 'nontestimonial' evidence is gathered, this is essentially
beyond police control. Their saying that an emergency exists cannot make
it be so. *The [c]onfrontation [c]lause in no way governs police conduct,
because it is the trial use of, not the investigatory collection of, ex parte
testimonial statements which offends that provision.* But neither can police
conduct govern the [c]onfrontation [c]lause; testimonial statements are what
they are." (Emphasis altered.) *Davis* v. *Washington*, supra, 547 U.S. 832 n.6.

and apprehend a suspect from a prior crime, rather than to solve an ongoing emergency or crime in progress *at the time of the call.*[17] The defendant properly points out that the call at issue was made after the emergency had been averted and the complainant no longer was under any threat from the defendant because she already had escaped and had left him stranded on the side of the road. Thus, although the complainant might have needed emergency medical assistance at the time she made the call, the bulk of her conversation with Gomes nevertheless consisted of her account of a crime that had happened to her in the recent past, rather than one that was happening to her at the time of the call. This renders the call, viewed as a whole,[18] distinct from the telephone call that was held nontestimonial in *Davis*, in which the declarant, a domestic violence victim calling to report that her former boyfriend was at her house beating her, "was speaking about events *as they were actually happening*, rather than 'describ[ing] past events . . . .' " (Citation omitted; emphasis in original.) Id., 827. Put differently, at the time of her telephone conversation with Gomes, the complainant in the present case was not under a "bona fide physical threat" at the hands of the defendant. Id. Her call was made for the purpose of reporting a past criminal act, rather than to avert a presently occurring one. This renders the telephone call recording testimonial and,

---

[17] The state contends that it is irrelevant to our inquiry that the call was made to a regular telephone number rather than to 911. We agree with this proposition in the limited context of this case because the telephone was dialed not by the complainant, but by Buck.

[18] We recognize that some isolated portions of the telephone call, specifically when the complainant described to Gomes the injuries and chest pains that affected her at the time of the conversation, are *not* testimonial in nature and, therefore, would not by themselves be barred under *Crawford*. We conclude, however, that the telephone recording remains inadmissible in its entirety because the recording is so heavily dominated by testimonial statements that redacting them in accordance with the procedure directed in *Davis* v. *Washington*, supra, 547 U.S. 829, would leave the nontestimonial portions of the conversation without any meaningful context.

therefore, inadmissible under *Crawford* in the absence of an opportunity for prior cross-examination by the defendant. Cf. *United States* v. *Thomas*, 453 F.3d 838, 844 (7th Cir. 2006) (applying *Davis* and concluding that 911 call was nontestimonial when anonymous caller reported there had just been shooting and shooter had immediately fled scene); *Jackson* v. *State*, 931 So. 2d 1062, 1063 (Fla. App. 2006) (applying *Davis* and concluding that 911 tape was nontestimonial when victim "described events as they were actually happening"); *Cook* v. *State*, Court of Appeals, Docket No. 01-05-00107-CR, 2006 Tex. App. LEXIS 6431, *6–7 (Tex. App. July 20, 2006) (immediate call to 911 to report intoxicated motorist who had just thrown beer bottle at caller's vehicle and gestured obscenely at him was nontestimonial because it reported "potential crime in progress"). We, therefore, conclude that the trial court improperly admitted the recording of the call into evidence.[19]

## 2

We conclude similarly as to the complainant's statements to Thornton at her home, which also were testimonial and, therefore, inadmissible under *Crawford* because the defendant lacked a prior opportunity for cross-examination. The facts and circumstances of this

---

[19] The state contends that the complainant's conversation with Gomes "objectively indicate[d] that the purpose of . . . Gomes' interrogation was to gain information to assess the ongoing event in order to provide appropriate assistance." We disagree with the state's broad portrayal of the circumstances of the call, and its description of the facts of this case as "constitut[ing] an ongoing public safety emergency and a possible medical emergency . . . ." Even if we were to accept the state's contention that the complainant was hysterical and in need of medical assistance, those portions of the call explaining what had happened to her at the hands of the defendant did not point to an ongoing emergency, but rather to an explanation of past events. Put differently, accepting the state's arguments on this point would render meaningless the distinction drawn by the United States Supreme Court, as they would render virtually any telephone report of a past violent crime in which a suspect was still at large, no matter the timing of the call, into the report of a "public safety emergency."

case indicate that, as in *Davis*, the officer's questioning was directed not at seeking "to determine . . . 'what is happening,' but rather 'what happened.' Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer should have done." *Davis* v. *Washington*, supra, 547 U.S. 830. In the present case, just as in *Davis*, any emergency with respect to the complainant had ceased because the alleged crimes no longer were in progress and she was rendered protected by Thornton's presence at her home, which constituted part of the alleged crime scene in this case. Id., 831. In this respect, we find instructive *State* v. *Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006), a recent case in which the West Virginia Supreme Court of Appeals applied *Davis* and concluded that a trial court had improperly permitted sheriffs' deputies to testify about statements by a domestic violence victim because "[i]t is clear from the circumstances that the deputies' interrogation of [the victim] was part of an investigation into possibly criminal past conduct." In so holding, the court emphasized that the perpetrator had departed the scene and there "was no emergency in progress when [they] arrived . . . ." Id.; cf. *State* v. *Reardon*, Court of Appeals, Docket No. CR-2005-1177, 2006 Ohio App. LEXIS 3960, *7–8 (Ohio App. August 4, 2006) (statements to police officers responding to home invasion nontestimonial and concerned "ongoing emergency" when suspects were still fleeing scene upon officers' arrival). In the present case, Thornton's presence and the fact that the defendant, the alleged perpetrator, was located some distance away, rendered the primary purpose of Thornton's interaction with the complainant investigatory, and her answers to his questions testimonial statements. Accordingly, the

trial court improperly permitted Thornton to testify about the complainant's statements to him.[20]

Moreover, the state does not argue in its primary or supplemental briefs that the admission of the statements to Gomes or Thornton, in violation of the defendant's confrontation clause rights, constituted harmless error beyond a reasonable doubt. Accordingly, we must reverse the judgment of the trial court and remand the

---

[20] Our conclusion that the complainant's statements to the police officer are inadmissible under *Crawford* and *Davis* is not inconsistent with our recent decision in *State* v. *Greene*, 274 Conn. 134, 874 A.2d 750 (2005), cert. denied, 548 U.S. 926, 126 S. Ct. 2981, 165 L. Ed. 2d 988 (2006), a case decided prior to *Davis* that was our first opportunity to consider the admissibility under *Crawford* of hearsay statements made to a police officer who had responded to the scene of a crime. In *Greene*, we concluded that, "where a victim contacts a police officer immediately following a criminal incident to report a possible injury and the officer receives information or asks questions to ensure that the victim receives proper medical attention and that the crime scene is properly secured, the victim's statements are not testimonial in nature because they can be 'seen as part of the criminal incident itself, rather than as part of the prosecution that follows.' " Id., 172. In so concluding, we followed the majority of sister state cases decided prior to *Davis* addressing on-scene statements to police officers, and determined that, under *Crawford*, two police officers properly could testify concerning the assault victim's statements to them about the circumstances of his shooting and his injury, which had occurred immediately following a shooting spree through a neighborhood in which the defendant had participated. Id., 165, 173.

We conclude that *Greene* is distinguishable from both the present case and *Davis*, and, therefore, remains good law in light of the United States Supreme Court's recent decision. The statements in *Greene* were near contemporaneous with a shooting spree on the street, in which numerous perpetrators were still at large, and the safety of the citizens in the vicinity was still immediately at issue. At that point, it reasonably and objectively could be said that the police officers' "primary purpose" in their questioning was to secure the scene and ascertain what had happened. Indeed, as the Supreme Court noted in *Davis*, it explicitly "[did] not hold . . . that *no* questions at the scene will yield nontestimonial answers. We have already observed of domestic disputes that '[o]fficers called to investigate . . . need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.' . . . Such exigencies may *often* mean that 'initial inquiries' produce nontestimonial statements." (Citation omitted; emphasis in original.) *Davis* v. *Washington*, supra, 547 U.S. 832.

case for a new trial. This case does, however, present us with a variety of issues that are likely to arise again on remand. We turn to them now, beginning with the defendant's third *Crawford* claim.

C

*Crawford* Issues with Respect to Statements
Made to Knapp

The defendant does not contest the admissibility of the complainant's statements to Knapp under the medical treatment exception to the hearsay rule, specifically § 8-3 (5) of the Connecticut Code of Evidence,[21] but asks us to conclude that the trial court should have excluded the portions of Knapp's testimony repeating the complainant's statements that she had been " 'kidnapped,' " which he considers accusatory and, therefore, testimonial under *Crawford*. The defendant also argues that the complainant's statement to Knapp was testimonial because of the involvement of the police at the scene. The state argues in response that these statements were not testimonial because they were part of Knapp's immediate response to and medical assessment of the complainant at the scene. We agree with the state.

We begin with a review of Knapp's testimony before the trial court at the motions hearing and before the jury. At the motions hearing, Knapp testified about the complainant's "distraught" and "shak[en]" appearance and about her visible injuries and complaints, including chest and stomach pain, swollen wrists from having her hands tied, and numerous abrasions and lacerations.

---

[21] Section 8-3 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule . . .

(5) A statement made for purposes of obtaining medical treatment or advice pertaining thereto and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to the medical treatment or advice."

Knapp and his partner photographed her injuries, and those photographs were admitted at trial. In accordance with his usual medical assessment procedure, Knapp questioned her about the source of her injuries. The complainant told Knapp that she had been "thrown down" and "taken for several hours," but said nothing else other than that she had been to the kidnapper's home before she broke free. Knapp then testified about the first aid and transportation process to Lawrence and Memorial Hospital in New London. The complainant did not tell Knapp who had abducted her, or about the use of a stun gun. At the house, Thornton listened to Knapp's questioning, but did not himself participate in that questioning. Knapp testified consistently at trial. See footnote 8 of this opinion.

We note at the outset that, as with Gomes and Thornton, our review of the trial court's determination as to the testimonial nature of the complainant's statements to Knapp is plenary. See part I B of this opinion. The defendant's claim with respect to the complainant's statements to Knapp implicates the third formulation of testimonial statements under *Crawford*, namely, "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . ." (Internal quotation marks omitted.) *Crawford* v. *Washington*, supra, 541 U.S. 52. Most courts considering statements made for medical treatment, in cases that generally have arisen in the assessment and treatment of sexual assault victims, have concluded that, "if an interview is done strictly for medical purposes, and not in anticipation of criminal proceedings, the statement would be considered nontestimonial. . . . [I]f a statement is made as part of an investigation by government officials the statement is generally considered testimonial." (Citations omitted.) *State* v. *Blue*, 717 N.W.2d 558, 563 (N.D. 2006);

id., 564 (videotaped interview of child sex abuse victim by forensic examiner, taken one week after alleged assault, was testimonial when directed and witnessed by police detective); see also *People* v. *Vigil*, 127 P.3d 916, 926 (Colo. 2006) (With no police officer present, an objective witness in a child's position would not see the statements as testimonial because that "child would reasonably be interested in feeling better and would intend his statements to describe the source of his pain and his symptoms. In addition, an objectively reasonable seven-year-old child would expect that a doctor would use his statements to make him feel better and to formulate a medical diagnosis. He would not foresee the statements being used in a later trial."); *In re T.T.*, 351 Ill. App. 3d 976, 992, 815 N.E.2d 789 (2004) (The child victim's statements to a pediatrician "describing the cause of symptoms or pain or the general character of the assault were not testimonial in nature. . . . However, [the victim's] statement identifying [the] respondent as the perpetrator was testimonial . . . ." [Citation omitted.]); *Commonwealth* v. *DeOliveira*, 447 Mass. 56, 64, 849 N.E.2d 218 (2006) (child victim's statements "cannot persuasively be said to have been made in response to police interrogation" when police were present at hospital, but not for examination, and they had not "instructed the doctor on the manner in which his examination should proceed"); *Foley* v. *State*, 914 So. 2d 677, 685 (Miss. 2005) (child victim's statements to physicians not testimonial because they "were made as a part of neutral medical evaluations" and medical professionals did not contact and were not being used by police); *State* v. *Moses*, 129 Wash. App. 718, 730, 119 P.3d 906 (2005) (Domestic violence victim's explanation to an emergency room physician of how her jaw was injured was not testimonial because the "purpose of [the physician's] examination was for medical diagnosis and treatment of [the victim's] significant injuries. [The

physician] had no role in the investigation of the assault and he was not working on behalf of or in conjunction with the police or governmental officials to develop testimony for the prosecution."), review denied, 157 Wash. 2d 1006, 136 P.3d 759 (2006).

The key to the inquiry is whether the examination and questioning were for a "diagnostic purpose" and whether the "statement was the by-product of substantive medical activity." *In re T.T.*, supra, 351 Ill. App. 3d 992; id., 993 (pediatrician's "primary investment in cooperating with law enforcement agencies was in facilitating the least traumatic method of diagnosis and treatment for the alleged victim, rather than a specific interest in enforcing sexual abuse laws"). Also significant to whether the statement is testimonial is whether "such statements . . . accuse or identify the perpetrator of the assault." Id.; but see *Wallace* v. *State*, 836 N.E.2d 985, 996 (Ind. App. 2005) (dying victim's statements to emergency medical technician and emergency room nurse identifying defendant as shooter not testimonial because record contained no indication that inquiries were "taken in significant part for purposes of preserving it for potential future use in legal proceedings, i.e., with an eye toward trial" [internal quotation marks omitted]).

We conclude that the complainant's statements to Knapp were not testimonial under *Crawford*, and, therefore, properly were admitted under the "firmly rooted" medical treatment hearsay exception, which satisfied the applicable rule of *Ohio* v. *Roberts*, supra, 448 U.S. 66. The statements did not identify the defendant as the assailant, and the complainant's statements about her kidnapping and assaults were relevant to Knapp's determination of the origin of her injuries. They were, therefore, germane to describing the complainant's need for "medical treatment," and were not "testimonial." Moreover, Knapp's questioning of the complain-

ant was secondary to the more detailed interview and statements taken by Thornton at the scene, which we have concluded were testimonial under *Crawford.* See part I B 2 of this opinion. Accordingly, the trial court properly admitted into evidence Knapp's testimony about the complainant's statements to him.

## II

## THE DEFENDANT'S MOTIONS TO SUPPRESS

### A

Whether Questioning at the Defendant's Residence Constituted a Custodial Interrogation Requiring *Miranda* Warnings

The defendant next claims that the trial court improperly denied his motion to suppress certain statements that he had made to the police at his residence, which he claims were made without benefit of *Miranda* warnings.[22] The defendant argues that the trial court improperly concluded that he was not the subject of a custodial interrogation at the time, and that *Miranda* warnings were, therefore, not required.

In its oral decision, following a suppression hearing, the trial court found that the defendant's statements were not the product of custodial interrogation because he had consented to the police entry of his home and the statements themselves were voluntary. The trial court credited the police officers' testimony that they had gone to the defendant's home only to get his side of the story as part of their investigation, they did not draw their weapons, he invited the officers into his home, and the defendant cooperatively and calmly told

[22] *Miranda* v. *Arizona,* 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ("[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed").

them that he had tied up the complainant and kidnapped her for money. The trial court further credited Beebe's testimony that the defendant had stated words to the effect of, "I guess I'm going with you," after relating his story of what had happened. The trial court concluded that the defendant was not in custody until he acknowledged that he was going with the officers and was handcuffed, both of which occurred after he told the police what had happened. The trial court further found that the defendant's statements at his residence were voluntary because there was no show of force and the defendant's will had not been "overborne in any way . . . ."

"Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . [A]lthough the circumstances of each case must certainly influence a determination of whether a suspect is in custody for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. . . . A person is in custody only if, in view of all the surrounding circumstances, a reasonable person would have believed [that] he was not free to leave. . . . Further, the United States Supreme Court has adopted an objective, reasonable person test for determining whether a defendant is in custody. . . . Thus, in determining whether *Miranda* rights are required, the only relevant inquiry is whether a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest. . . .

"The defendant bears the burden of proving that he was in custody for *Miranda* purposes. . . . Two discrete inquiries are essential to determine custody: first,

what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. . . . The first inquiry is factual, and we will not overturn the trial court's determination of the historical circumstances surrounding the defendant's interrogation unless it is clearly erroneous. . . . The second inquiry, however, calls for application of the controlling legal standard to the historical facts. . . . The ultimate determination of whether a defendant was subjected to a custodial interrogation, therefore, presents a mixed question of law and fact, over which our review is de novo." (Citations omitted; internal quotation marks omitted.) *State* v. *Turner*, 267 Conn. 414, 434–35, 838 A.2d 947, cert. denied, 543 U.S. 809, 125 S. Ct. 36, 160 L. Ed. 2d 12 (2004).

In the present case, the defendant does not attack the trial court's underlying factual findings, and our review of the record indicates that they are supported by the testimony of the various police officers, including Beebe and Thornton. Rather, the defendant contends that a reasonable person would not have felt free to leave because five police officers arrived at his house in separate vehicles at approximately 4:30 a.m., and that opening his door and inviting the officers inside was only "bowing to superior force" because his choice was interrogation in the dark outside, or interrogation inside the lighted house. He also notes that the officers did not tell him that he was free to leave or to ask them to leave.

We conclude that the trial court properly determined that the defendant did not carry his burden of proving that he was in custody at the time he made his initial statement to the police. We find instructive our decision in *State* v. *Johnson*, 241 Conn. 702, 719–20, 699 A.2d 57 (1997), in which we concluded that the interview of a

suspect in the kitchen of his father's house was not custodial. In *Johnson,* detectives investigating the murder of a state trooper during the course of a burglary went to the home of the suspect's father, where the vehicle considered the getaway car had supposedly been parked at the time of the shooting. Id., 716. Two detectives and a uniformed police officer went to the house and saw the car—they then saw the defendant, the suspect's brother, approach the house in his car, slow down as if to turn, but continue past the driveway. Id. "Suspecting that the defendant might know something about [his brother's] involvement in the burglary and shooting, [one detective] and the uniformed police officer entered the unmarked police car and drove after the defendant. They had driven approximately 100 yards when the defendant turned his car around and returned to the house. The police followed him into the driveway.

"The detectives asked the defendant if he would be willing to speak to them inside the house. The defendant agreed. The detectives also asked the defendant's father for permission to speak with his son in his house. He also agreed. The two detectives and the defendant sat at the kitchen table while the defendant's father and the uniformed police officer stayed outside. [One detective] told the defendant that the defendant knew why the detectives were there and that the defendant had a story to tell. [The other detective] then produced a copy of the composite drawing. The defendant stated that he did not know how to begin, and [the first detective] suggested that the defendant use a 'once upon a time' method. The defendant then told the detectives about the burglary and the shooting of [a state trooper]. At some point during the defendant's recounting of events, his father entered the kitchen to get a portable telephone and left. The detective then asked the defendant to repeat the story with more detail, and the defendant did so." Id., 716–17.

This court concluded that the interrogation was not custodial, noting that, "[t]he interview took place in the familiar surroundings of his father's kitchen. There was no evidence that the defendant was ever handcuffed or otherwise restrained at the time of the statements, nor did the officers use or threaten the use of force, or display their weapons. The court expressly found that the police had been neutral and reserved. The defendant had access to a telephone. The defendant's father entered the kitchen during this period. The defendant never expressed a desire to leave, stop talking, or speak with his father. Under these circumstances, we cannot conclude that the defendant has met his burden of proving custodial interrogation." Id., 720.

In the present case, evidence at the suppression hearing indicated that the police went to the house to speak to the defendant and get his side of what Beebe called a "fairly bizarre" story, and found the defendant to be calm and cooperative with them. He declined their request to step outside, but invited the police into his house. He told the police that he knew why they were there, and answered affirmatively in response to their question that it was about the complainant. The encounter lasted only ten or fifteen minutes. The officers' guns remained holstered, and the defendant was not hand-cuffed until *after* his arrest following his admission of involvement in the kidnapping, even at which point he was permitted to get his shoes. Accordingly, we conclude that the defendant's statement was not the product of custodial interrogation.

B

Whether Admission of the Defendant's Statement at the Police Station Violated *Miranda* and *Doyle*

The defendant next asks for suppression of a comment that he made to Officer Bryan Schneider after his arrest at the police station, claiming that: (1) the

statement was unwarned and in response to custodial interrogation in violation of *Miranda*; and (2) admission of the statement violated *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), because it resulted in using the invocation of silence against the defendant.

The record reveals the following additional relevant facts. After he was arrested, Schneider drove the defendant to Stonington police headquarters where he took the defendant into the booking area and removed his handcuffs. Schneider testified that he informed the defendant that he was looking to take a voluntary statement from him, and brought the "necessary paperwork," including a *Miranda* consent form, and the defendant into an interview room. Schneider and the defendant sat down, and Schneider explained the process, including the notice of rights form, to the defendant. Schneider testified that the officers read the warnings out loud to the defendant, and asked him to initial next to each warning after the defendant indicated that he understood the warnings. When asked whether he understood the warnings, the defendant was silent and did not respond to Schneider. When asked again whether he understood the warnings, the defendant then told Schneider that he was not interested in filling out paperwork because "[h]e stated that he knew what he had done was wrong, that we had what we wanted and that he wasn't gonna go around and around with paperwork. He just wanted to get it over with." Beebe then entered the room, explained the form to the defendant again, and the defendant just bowed his head and closed his eyes. The officers then stopped any questioning altogether. They did not question the defendant at all about the specifics of the events of that night, and attempted only to explain the warnings to him. The trial court concluded that admission of these statements did not violate *Miranda* because they were not the product of an interrogation, and did

not violate *Doyle* because they were statements and not silence or the invocation of the right thereto.[23] Schneider subsequently testified to this effect at trial.

## 1

The defendant claims that Schneider's questioning of the defendant as to whether he understood his rights constituted "custodial interrogation" requiring the reading of his *Miranda* rights because those inquiries constituted "express questioning" that also were " 'reasonably likely to elicit an incriminating response from the suspect.' " We disagree. In *Rhode Island* v. *Innis*, 446 U.S. 291, 300–302, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), the United States Supreme Court concluded that, "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. *A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.* But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or

---

[23] The trial court also rejected these arguments in conjunction with the defendant's motion for a new trial.

actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." (Emphasis added.)

Questions about whether a suspect understands his or her rights do not, without more, constitute " 'interrogation' " as that term was defined in *Rhode Island* v. *Innis*, supra, 446 U.S. 301–302, but rather are considered "words or actions" that are "normally attendant to arrest and custody . . . ." See *Shields* v. *State*, 269 Ga. 177, 179, 496 S.E.2d 719 (1998) (trial court properly denied motion to suppress defendant's statement following question about whether he understood his rights, which was "a routine and appropriate inquiry and we cannot conclude that it constituted interrogation" [internal quotation marks omitted]); *State* v. *Lescard*, 128 N.H. 495, 496–97, 517 A.2d 1158 (1986) (questioning about whether defendant understood his rights under implied consent statute "was in no way calculated to produce an incriminating response"); *Commonwealth* v. *Lark*, 505 Pa. 126, 133, 477 A.2d 857 (1984) ("fact that the police read appellant his rights and questioned him concerning his understanding of those rights did not violate his apparent wish to remain silent" because those actions were "normally attendant to arrest and custody"); accord *State* v. *Dobson*, 221 Conn. 128, 133, 602 A.2d 977 (1992) (serving arrest warrant on suspect in custody "is a procedural formality not tantamount to an initiation of interrogation"); *State* v. *Evans*, 203 Conn. 212, 225–27, 523 A.2d 1306 (1987) (discussing *Innis* and concluding with respect to "routine booking questions," that "not every express question posed in a custodial setting is equivalent to interrogation" when "routine, noninvestigatory questions were unrelated to the crime and were objectively neutral . . . [and] there is nothing in the record to suggest an improper motive on the part of the . . . police" [internal quotation marks omitted]). We, therefore, reject the defendant's

claim that Schneider's attempt to ensure that he understood his rights constituted impermissible custodial interrogation.

2

The defendant also claims that the state's introduction of Schneider's testimony constituted use of the defendant's invocation of his right to silence against him in violation of *Doyle* v. *Ohio*, supra, 426 U.S. 610, wherein "the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. The court based its holding [on] two considerations: First, it noted that silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value. Second and more important[ly], it observed that while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (Internal quotation marks omitted.) *State* v. *Cabral*, 275 Conn. 514, 523, 881 A.2d 247, cert. denied, 546 U.S. 1048, 126 S. Ct. 773, 163 L. Ed. 2d 600 (2005). "[I]t also is fundamentally unfair, and, therefore, a deprivation of due process, for the state to use evidence of a defendant's post-*Miranda* silence as affirmative proof at trial." (Internal quotation marks omitted.) Id., 524, citing *State* v. *Plourde*, 208 Conn. 455, 468, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989). Under *Doyle*, "silence . . . does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." (Internal quotation marks omitted.) *State* v. *Cabral*, supra, 524.

We conclude that the defendant has failed to establish a *Doyle* violation in the present case. With respect to the defendant's statement, specifically, that "he knew what he had done was wrong" and that he did not want to deal with "paperwork," this statement as testified to by Schneider was neither itself silence nor the invocation of the right to silence. Accordingly, "[t]he *Doyle* decision . . . is not applicable to the facts of this case. The crucial distinction is that, here, the defendant did not remain silent after he was arrested and advised of his rights. After being given *Miranda* warnings, the defendant clearly chose to [forgo] his right to remain silent." *State* v. *Talton*, 197 Conn. 280, 295, 497 A.2d 35 (1985); id. (defendant cannot use selective silence to tell police only exculpatory parts of story); see also *State* v. *Joly*, 219 Conn. 234, 256–57, 593 A.2d 96 (1991) ("[t]he factual predicate of a claimed *Doyle* violation is the use by the state of a defendant's postarrest and post*Miranda* silence either for impeachment or as affirmative proof of his guilt," and concluding that "the state offered [a police officer's] testimony for the permissible purpose of presenting the defendant's statements, not his refusals to speak, as evidence of his guilt"). Moreover, to the extent that any silence by the defendant after he made that statement was implicated in the present case, it is not a *Doyle* violation because "we have permitted the state some leeway in adducing evidence of the defendant's assertion of that right for purposes of demonstrating the investigative effort made by the police and the sequence of events as they unfolded . . . as long as the evidence is not offered to impeach the testimony of the defendant in any way." (Citation omitted; internal quotation marks omitted.) *State* v. *Cabral*, supra, 275 Conn. 525. Inasmuch as the defendant has not demonstrated any reliance by the state on his poststatement silence, such as its use in cross-examination or summations, we conclude that there is no *Doyle* violation in this case.

III

## WHETHER THE TRIAL COURT SHOULD HAVE ORDERED THE STATE TO GRANT IMMUNITY TO BUCK OR GRANTED THE DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

The defendant next claims that the trial court should have ordered the state to grant immunity, pursuant to § 54-47a,[24] to Buck, who invoked his privilege against

[24] General Statutes § 54-47a provides: "(a) Whenever in the judgment of the Chief State's Attorney, a state's attorney or the deputy chief state's attorney, the testimony of any witness or the production of books, papers or other evidence of any witness (1) in any criminal proceeding involving narcotics, arson, bribery, gambling, election law violations, felonious crimes of violence, any violation which is an offense under the provisions of title 22a, corruption in the executive, legislative or judicial branch of state government or in the government of any political subdivision of the state, fraud by a vendor of goods or services in the medical assistance program under Title XIX of the Social Security Act amendments of 1965, as amended, any violation of chapter 949c, or any other class A, B or C felony or unclassified felony punishable by a term of imprisonment in excess of five years for which the Chief State's Attorney or state's attorney demonstrates that he has no other means of obtaining sufficient information as to whether a crime has been committed or the identity of the person or persons who may have committed a crime, before a court or grand jury of this state or (2) in any investigation conducted by an investigatory grand jury as provided in sections 54-47b to 54-47g, inclusive, is necessary to the public interest, the Chief State's Attorney, the state's attorney, or the deputy chief state's attorney, may, with notice to the witness, after the witness has claimed his privilege against self-incrimination, make application to the court for an order directing the witness to testify or produce evidence subject to the provisions of this section.

"(b) Upon the issuance of the order such witness shall not be excused from testifying or from producing books, papers or other evidence in such case or proceeding on the ground that the testimony or evidence required of him may tend to incriminate him or subject him to a penalty or forfeiture. No such witness may be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he is compelled to testify or produce evidence, and no testimony or evidence so compelled, and no evidence discovered as a result of or otherwise derived from testimony or evidence so compelled, may be used as evidence against him in any proceeding, except that no witness shall be immune from prosecution for perjury or contempt committed while giving such testimony or producing such evidence. Whenever evidence is objected to as inadmissible because it was discovered as a result of or otherwise derived from compelled testimony or evidence, the burden shall be upon the person offering the

self-incrimination pursuant to the fifth amendment to the United States constitution; see footnote 5 of this opinion; or have granted the defendant's motions for judgment of acquittal or a new trial.

"As a threshold matter, we must first determine the applicable standard of review that governs our examination of the defendant's claims. The issue of whether a defendant's rights to due process and compulsory process require that a defense witness be granted immunity is a question of law and, thus, is subject to de novo review. . . .

"[A] defendant has a right under the compulsory process and due process clauses to present [his] version of the facts as well as the prosecution's to the jury so [that] it may decide where the truth lies. . . . The compulsory process clause of the sixth amendment generally affords an accused the right to call witnesses whose testimony is material and favorable to his defense . . . .

"We begin our analysis with the statutory provision concerning prosecutorial immunity for witnesses. [Section] 54-47a authorizes the prosecution to grant immunity to state witnesses under certain circumstances. We explicitly have held that § 54-47a confers no such authority upon the courts with regard to defense witnesses. . . . Indeed, this court has held repeatedly that there is no authority, statutory or otherwise, enabling a trial court to grant immunity to defense witnesses. . . . We have no occasion to revisit those holdings today.

"We recognize that other courts have held that under certain compelling circumstances the rights to due process and compulsory process under the federal consti-

challenged evidence to establish a source independent of the compelled testimony or evidence."

tution require the granting of immunity to a defense witness. The federal Circuit Courts of Appeals have developed two theories pursuant to which the due process and compulsory process clauses entitle defense witnesses to a grant of immunity. They are the effective defense theory, and the prosecutorial misconduct theory. . . . Because such circumstances are not presented in this case, however, we need not decide whether either theory is a correct application of the due process or compulsory process clause.

"Under the effective defense theory . . . the trial court has the authority to grant immunity to a defense witness when it is found that a potential defense witness can offer testimony which is clearly exculpatory and essential to the defense case and when the government has no strong interest in withholding . . . immunity . . . . The Third Circuit [Court of Appeals] has held explicitly that under the effective defense theory [i]mmunity will be denied if the proffered testimony is found to be ambiguous [or] not clearly exculpatory . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Holmes*, 257 Conn. 248, 252–55, 777 A.2d 627 (2001), cert. denied, 535 U.S. 939, 122 S. Ct. 1321, 152 L. Ed. 2d 229 (2002).

The prosecutorial misconduct theory of immunity "is based on the notion that the due process clause [constrains] the prosecutor to a certain extent in [its] decision to grant or not to grant immunity. . . . Under this theory, however, the constraint imposed by the due process clause is operative only when the prosecution engages in certain types of misconduct," which include forcing the witness to invoke the fifth amendment or engaging in discriminatory grants of immunity to gain a tactical advantage, and the testimony must be material, exculpatory and not cumulative, and the defendant must have no other source to get the evidence. (Cita-

tions omitted; internal quotation marks omitted.) Id., 256–57.

The present case again provides us with no occasion to reach either of these immunity theories. The defendant has not pointed to anything that Buck might testify to as "clearly exculpatory," and cites as "misconduct" only the state's use of hearsay testimony of an unavailable complainant who may have had some prior animosity against the defendant, an act that has some confrontation clause implications, but does not rise to the level of prosecutorial gamesmanship or misconduct. Thus, we again leave to another day consideration of either theory of immunity under the due process clause.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.